IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

TRACEY K. STOLL-MINER,

       Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

No. C11-0037

RULING ON JUDICIAL REVIEW

---

## TABLE OF CONTENTS

I.      *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    *PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . 2

III.   *PRINCIPLES OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.   *FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     A.   *Stoll-Miner's Education and Employment Background* . . . . . . . . . 6
     B.   *Administrative Hearing Testimony* . . . . . . . . . . . . . . . . . . . . 6
          1.   *Administrative Hearing on December 22, 2008* . . . . . . . . . . 6
              a.   *Stoll-Miner's Testimony* . . . . . . . . . . . . . . . . . . 6
              b.   *Vocational Expert's Testimony* . . . . . . . . . . . . . . . 10
          2.   *Administrative Hearing on December 7, 2010* . . . . . . . . . . 11
              a.   *Stoll-Miner's Testimony* . . . . . . . . . . . . . . . . . . 11
              b.   *Vocational Expert's Testimony* . . . . . . . . . . . . . . . 14
     C.   *Stoll-Miner's Medical History* . . . . . . . . . . . . . . . . . . . . . 14

V.    *CONCLUSIONS OF LAW* . . . . . . . . . . . . . . . . . . . . . . . . . 25
     A.   *ALJ's Disability Determination* . . . . . . . . . . . . . . . . . . . . 25
     B.   *Objections Raised By Claimant* . . . . . . . . . . . . . . . . . . . . 27
          1.   *Dr. Ely's Opinions* . . . . . . . . . . . . . . . . . . . . . 28
          2.   *Dr. Schultes' Opinions* . . . . . . . . . . . . . . . . . . . 31
          3.   *Credibility Determination* . . . . . . . . . . . . . . . . . . 33

VI.   *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

VII.  *ORDER* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Tracey K. Stoll-Miner on March 29, 2011, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Stoll-Miner asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Stoll-Miner requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On November 7, 2005, Stoll-Miner applied for both disability insurance benefits and SSI benefits. In her applications, Stoll-Miner alleged an inability to work since May 20, 2002 due to fibromyalgia and depression. Stoll-Miner's applications were denied on May 19, 2006. On December 4, 2006, her applications were denied on reconsideration. On January 10, 2007, Stoll-Miner requested an administrative hearing before an Administrative Law Judge ("ALJ"). On December 22, 2008, Stoll-Miner appeared via video conference with her attorney before ALJ Alice Jordan for an administrative hearing. Stoll-Miner and vocational expert George B. Paprocki testified at the hearing. In a decision dated February 2, 2009, the ALJ denied Stoll-Miner's claims. The ALJ determined that Stoll-Miner was not disabled and not entitled to disability insurance benefits or SSI benefits because she was functionally capable of performing her past relevant work as a hotel manager and an eye specialist. The ALJ also determined that in the alternative, even if Stoll-Miner could not perform her past relevant work, she could perform other work that exists in significant numbers in the national economy. Stoll-Miner appealed the ALJ's decision. On May 20, 2009, the Appeals Council denied Stoll-Miner's request for review. Consequently, the ALJ's February 2, 2009 decision was adopted as the Commissioner's final decision.

On July 22, 2009, Stoll-Miner filed an action for judicial review in the Northern District of Iowa. *See* case number 1:09-cv-00096-JSS. The Commissioner filed an answer on September 21, 2009. On May 6, 2010, the Court entered a ruling reversing and remanding the action for further proceedings, requiring the ALJ to fully and fairly develop the record. *See* docket number 18, in case number 1:09-cv-00096-JSS.

On December 7, 2010, Stoll-Miner appeared with counsel, via video conference, before ALJ Diane Raese Flebbe, for an administrative hearing on remand.[1] Stoll-Miner and vocational expert George B. Paprocki testified at the hearing. In a decision dated January 7, 2011, the ALJ denied Stoll-Miner's claims. The ALJ determined that Stoll-Miner was not disabled; and therefore, not entitled to disability insurance benefits or SSI benefits because she was functionally capable of performing work that existed in significant numbers in the national economy. Because the Appeals Council did not review the remand decision on its own motion, and Stoll-Miner did not file a special exception for review of the remand decision with the Appeals Council, the ALJ's January 7, 2011 was adopted as the Commissioner's final decision. *See* 20 C.F.R. § 404.984 (explaining Appeals Council review of an ALJ's decision in a case remanded by a federal court).

On March 29, 2011, Stoll-Miner filed this action for judicial review. The Commissioner filed an answer on July 22, 2011. On August 25, 2011, Stoll-Miner filed

---

[1] In her decision, the ALJ states that Stoll-Miner "filed an application for disability benefits in 2009 that has been combined with the present claim for benefits, this decision is dispositive of all pending applications as of the date of this decision." Administrative Record at 400. Interestingly, the administrative record contains no application for disability benefits from 2009, and no denials of disability benefits from 2009. Moreover, in their briefs, the parties make no reference to any type of disability benefits application(s) from 2009. Because the parties do not address an application or applications for disability benefits from 2009, and the administrative record contains no evidence that Stoll-Miner applied for benefits in 2009, the Court considers the ALJ's discussion of an application(s) for benefits in 2009 to be a typographical error. Accordingly, the Court's review of this matter will focus solely on Stoll-Miner's 2005 applications for disability insurance benefits and SSI benefits, and the issues to be considered on remand.

a brief arguing there is not substantial evidence in the record to support the ALJ's finding that she was not disabled and that there was other work that exists in significant numbers in the national economy that she could perform. On October 25, 2011, the Commissioner filed a responsive brief arguing the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On June 1, 2011, both parties consented to proceed before the undersigned in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III.  PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the ALJ's decision if it is supported by substantial evidence on the record as a whole." *Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) (citation omitted). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Id.* (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)); *see also Wildman v. Astrue*, 596 F.3d 959, 963-64 (8th Cir. 2010) ("'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.' *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence."

*Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted).  The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision.  *Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision.").  In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)).  In *Casey v. Astrue*, 503 F.3d 687 (8th Cir. 2007), the Eighth Circuit further explained that a court "will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'"  *Id.* at 691 (citations omitted).  "A decision is not outside that 'zone of choice' simply because [a court] may have reached a different conclusion had [the court] been the fact finder in the first instance."  *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006).  Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole."  *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman*, 596 F.3d at 964 ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently.");  *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also

be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV.  FACTS

### A.  Stoll-Miner's Education and Employment Background

Stoll-Miner was born in 1968.  She completed four years of high school, but did not graduate because she was two credits shy of the graduation requirements.  Stoll-Miner did not return to school, or earn the remaining two credits necessary for graduation.  She also never earned a GED.

The record contains a detailed earnings report for Stoll-Miner.  The report covers Stoll-Miner's employment history from 1978 to 2008.  She had no earnings from 1978 to 1983.  Stoll-Miner had a large range of earnings from 1984 to 2002, including a low of $211.50 (1984) to a high of $16,001.66 (2001).  She had no earnings in 2003, and earned $220.50 in 2004.  Stoll-Miner has no earnings since 2005.

### B.  Administrative Hearing Testimony

#### 1.    Administrative Hearing on December 22, 2008

##### a.    Stoll-Miner's Testimony

At the administrative hearing, the ALJ began her questioning by inquiring when Stoll-Miner last had a regular job.  Stoll-Miner replied that she last worked as a general manager in a hotel until 2002.  She quit the hotel job after her sister was murdered and she relapsed on drugs.  The ALJ asked Stoll-Miner to describe her drug problems.  Stoll-Miner explained that:

> I was using cocaine but then got clean and I was clean for about two and a half years I think it is.  And then my sister got murdered and I relapsed but I haven't used since November 17 of 2004, so I'm doing okay.  I won't even take the pain pills that the doctors prescribed for my pain because I'm scared I'd relapse.

(Administrative Record at 36.)

Next, the ALJ asked Stoll-Miner to explain why she hadn't worked since 2002:

> Q:   So then you [] relapse[d,] and then in '04 you did a little bit of work.  Where and why have you not done any work since then?
>
> A:   The pain.
>
> Q:   What pain?
>
> A:   It's -- okay.  First my lungs.  I have a hard time breathing and I did that to myself.  The pain --
>
> Q:   What do --
>
> A:   -- as far as the fibromyalgia.  I ache constantly 24 hours a day.  If I stay in one position too long I'm sore.  I can't stand.  My legs can't handle the weight very long.  My hands cramp up.  I don't even cross-stitch anymore because of my hands.  So its everywhere.  It's in my lower back.  It's in my knees.  I can't lift any form of weight.
>
> Q:   What is wrong with your lungs?
>
> A:   I have COPD.  I have a really hard time breathing.  If I do any form of walking at all I'm out of breath.

(Administrative Record at 37-38.)  The ALJ also asked Stoll-Miner why she believed she was unable to work at a sedentary job.  Stoll-Miner answered that the pain from her fibromyalgia would make sitting for an eight-hour workday very difficult.  She stated "I'm in pain constantly.  I move from my couch to my chair, my bed to the couch to the chair to the bed.  I don't do the stairs.  I have the kids -- neighbor kids who come walk my dog for me because I don't even walk my own dog."[2]  Stoll-Miner testified that she takes some medication for pain relief, such as Ibuprofen and Nortriptyline, but it only dulls the pain.  The ALJ further asked why Stoll-Miner believed she couldn't work, even with pain medication:

> Q:   . . . You're taking several things here that should help alleviate some of the pain.
>
> A:   And they do help alleviate it.  It's not as bad as it could be. . . .
>
> Q:   But you don't believe that you still could do a job?

---

[2] Administrative Record at 38.

A:    I have tried.  Yeah, but I've been working my whole life.  I don't want to sit at home but I can't hold down a job and when I wake up in pain that's so bad I can't see straight what job's going to hire me on me missing two or three days a week?

Q:    What makes you think you'd miss two or three days a week?

A:    The same reason I left Casey's.  I went down there and worked for them for a week and a half.  I was in so much pain every day.

(Administrative Record at 39-40.)

Next, the ALJ asked Stoll-Miner to describe her pain.  Stoll-Miner testified that she suffers from back aches, pain in her hips, fingers, and ankles, and constant muscle spasms. The ALJ also questioned Stoll-Miner regarding her typical daily activities:

Q:    How much television do you watch during the day?

A:    Probably about three hours in the day and then probably about three hours in the evening. . . .

Q:    And do you do your own cooking?

A:    I do a lot of quick cooking.  A lot of things I can microwave.

Q:    How about your laundry?

A:    The kids carry the laundry up, do it -- put it in the thing and I do fold my own laundry and the kids put it away for me. . . .

Q:    Okay.  Do you do your dishes?

A:    No.  [The kids] either help me do the dishes or when I do[,] do my own dishes.  Just a regular set of dishes probably takes me two or three times.  I run the water, let them soak, and then I get up and I wash a sink load and then I have to sit back down because I can't stand that long.  My back and legs are killing me.

Q:    Okay.  Do you do any of the vacuuming or the mopping or sweeping?

A:    No. Absolutely no vacuuming and no sweeping. . . .

Q:    Who does the grocery shopping?

A:    I go in with a lady.  Pauline Walters.  We go into town probably once a week and just pick up little necessities. In my back parking lot is Jack and Jill grocery store and

> if I'm so bad I can't walk over that day I'll call them
> and they'll have somebody bring my stuff over and get
> my food card.
>
> Q:   Okay.  And do you ever do any yard work or anything
>      like that?
> A:   No, ma'am. . . .
> Q:   Do you take care of your own personal hygiene?
> A:   I do. I do.  I can't take baths but I have a shower I
>      take.

(Administrative Record at 40-42.)

Lastly, the ALJ questioned Stoll-Miner regarding her functional abilities.  First, the ALJ asked how long Stoll-Miner could sit at one time.  Stoll-Miner replied that she could sit for 20 to 30 minutes before getting "real restless."  Second, the ALJ inquired as to how long Stoll-Miner could stand at one time.  Stoll-Miner answered that she could stand for about 10 or 15 minutes.  Third, the ALJ asked Stoll-Miner how far she could walk at one time.  She replied that she is capable of walking about three blocks at one time.  Fourth, the ALJ questioned Stoll-Miner about her ability to lift things.  Stoll-Miner stated that she could not lift groceries and could probably lift 10 pounds one time.  She further testified that she has difficulty stooping, kneeling, and climbing stairs.

Stoll-Miner's attorney also questioned Stoll-Miner at the administrative hearing.  Stoll-Miner's attorney asked Stoll-Miner whether she had difficulty sleeping.  According to Stoll-Miner, "I can't sleep more than maybe two ours at a time tops and then I'm up because I'm so sore."[3]  She also testified that she naps during the day because she is constantly fatigued.

Next, Stoll-Miner's attorney asked Stoll-Miner if there were things that make her fibromyalgia pain worse.  Stoll-Miner replied that cold weather makes her "more sore."  She also testified that if she is active during the day, the next day she is "really sore from

---

[3] Administrative Record at 45.

just getting up and getting out of the house[.]"[4] Stoll-Miner's attorney also asked Stoll-Miner how often she leaves her house:

Q:  So are there days when you don't go out of the house at all?
A:  Probably at least five days a week.
Q:  When you do go out of the house where do you go?
A:  The only places I go are doctor's appointments, church, and to pick up a few groceries with Pauline. Those are the only places I go.
Q:  And how do you get to the doctor's appointment if you're --
A:  Pauline Walters takes me. Pauline Walters picks me up for church, takes me to my doctor's appointments. She takes me grocery shopping. My best friend's an 84-year-old woman who is better than me.

(Administrative Record at 46.)

Lastly, Stoll-Miner's attorney asked Stoll-Miner to discuss her difficulties with depression. Stoll-Miner testified that her depression would make working difficult because she is unable to handle change very well. She also stated that she has difficulty remembering things, and performs her everyday activities at a slow pace. Specifically, she stated "I can't finish a task from beginning to end without stopping" due to pain.[5] She also indicated that being around people makes her nervous because she doesn't "trust people."

### b.    *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert George B. Paprocki with a hypothetical for an individual:

with an exertional level limited to light work with the following limitations. They've given an occasional on all posturals. They don't, but I'm going to go ahead and give an

---

[4]  *Id.* at 46.

[5]  Administrative Record at 51.

> avoid concentrated exposure to -- she said she was affected greatly by the heat and cold and humidity. Also, . . . avoid even moderate exposure to fumes, odors, dust, gases. And I'm sure that's because of the asthma and the bronchitis and all. Okay. I think that's all that I really see, and I assume the occasional was probably because of the fibromyalgia and the obesity here that they've given an occasional on most of these postural limitations.

(Administrative Record at 56.) The vocational expert testified that under such limitations, Stoll-Miner could perform her past relevant work as a hotel manager and eye specialist at the light level of work, as the work is done in the national economy. The vocational expert further testified that she could not perform the hotel manager job at the medium level of work under the same limitations. The vocational expert also concluded that Stoll-Miner could perform the following work: (1) receptionist or information clerk (collectively 10,000 positions in the region and 1,100,000 positions in the nation), (2) service clerk (300 positions in the region and 30,000 positions in the nation), and clerical sorter (1,000 positions in the region and 250,000 positions in the nation).

### 2. Administrative Hearing on December 7, 2010

#### a. Stoll-Miner's Testimony

At the second administrative hearing, the ALJ asked Stoll-Miner why she believed she became disabled on May 20, 2002. Stoll-Miner answered that she was diagnosed with fibromyalgia on that date. Next, the ALJ inquired why the diagnosis by itself made her disabled. Stoll-Miner replied that "[j]ust the pain, just finally being justified, because I've had all this pain, and I just thought, you know, they tell you for a while it's in your head. And then you finally realize that, no, it's real. . . . But, I just was to the point where I couldn't get up and run a regular day, a regular routine day, you know?"[6] The ALJ also asked Stoll-Miner what she thought her most severe impairment was that kept her from

---

[6] Administrative Record at 432.

working.  Stoll-Miner stated that it was a toss-up between fibromyalgia and peripheral neuropathy.

The ALJ asked Stoll-Miner to discuss her difficulties with fibromyalgia:

> Q:  Well, let's talk about the fibromyalgia first, then.
>
> A:  The fibromyalgia is, you just ache so bad you just can't, you can't function.  You can't function.  You can't sorry.
>
> Q:  And, over time --
>
> A:  You can't concentrate.  It hurts so bad I can't concentrate.  Moving around, doing daily things have become an obstacle, you know?
>
> Q:  So, over time, has this gotten better, worse, or stayed the same?
>
> A:  Worse.  Much worse.
>
> Q:  And that's despite having treatment?
>
> A:  Despite having treatment, yes.
>
> Q:  So, treatment's not helping?
>
> A:  No.  It's not making any difference. . . .
>
> Q:  What kinds of things make your fibromyalgia worse, please?
>
> A:  I don't drink at all.  Alcohol makes it real bad, but I don't drink anymore.  Spending too much time on my feet. Laundry.  Oh, laundry makes it worse.  I'm not allowed to run a vacuum or a broom or anything.  It makes my muscles so sore.  Cold makes my body ache even worse.  The muscle tissue just hurts terrible bad.
>
> Q:  Is there anything that makes your fibromyalgia better?
>
> A:  Actually, pool.  Spending time in a hot tub does, but I don't have access to those things.

(Administrative Record at 433-35.)  The ALJ also asked Stoll-Miner to discuss her difficulties with peripheral neuropathy:

> Q:  Okay.  Now, you said that besides the fibromyalgia, your next most serious problem is your peripheral neuropathy.
>
> A:  Yeah.  That's the feet.  They constantly are in a state of pain, constantly.  I'd have to say my feet hurt worse than anything on my whole body at all times.  It used be in the bottom of my feet, but now it's moved up

12

> around my ankles, because my whole foot, they feel constantly, like, I got pins and needles in them.  It makes me feel like --
>
> Q:   And you said that the Lyrica is helping?
>
> A:   It's, yeah.  Compared to not having Lyrica, I was real, real bad off before I got on the Lyrica.
>
> Q:   So, how --
>
> A:   On a daily basis, on a daily basis, there was sometimes I didn't want to get out of bed because it just hurt so bad that I just wished I would go to sleep and not wake up. . . .
>
> Q:   Is there any thing that makes the peripheral neuropathy worse?
>
> A:   Yeah.  Cold.  Hot.  Walking.  I can't sit in the doctor's table.  They have to put something on there so I can prop my feet up.  If I dangle my feet at all, it's just excruciating.
>
> Q:   Is there anything that makes it better?
>
> A:   The Lyrica makes it survivable.

(Administrative Record at 435-36.)

Stoll-Miner's attorney also questioned Stoll-Miner.  First, Stoll-Miner's attorney inquired how often Stoll-Miner lies down in a typical day.  She replied that she takes about 3, hour-long naps each day.  Stoll-Miner's attorney also asked Stoll-Miner to discuss the help she receives from other people on a typical day:

> Q:   Now, you talked to, about people who would, in your typical day, come down and do things for you.  Do they come down to socialize, or do they come down to help you out?
>
> A:   They come down to help me out.  I mean, probably, we'll socialize.  But I have a hard time tolerating people sometimes.  Excuse me.  Because you hate to see what other people can do and you can't do it. . . .
>
> Q:   So, people help you out by walking your dog.
>
> A:   Taking my laundry, because the laundry is on the top floor and I ain't going up and down those stairs.  It just wipes me out.  It just.  And so, they'll do my laundry

13

> for me.  If I need any kind of groceries.  They'll go pick up
> my mail for me. . . .

(Administrative Record at 459.)

### b.     Vocational Expert's Testimony

At the second hearing, the ALJ provided vocational expert George B. Paprocki with

a hypothetical for an individual with the:

> ability to lift and carry 20 pounds occasionally and 10 pounds
> frequently; sit six hours a day, stand and walk six hours a day;
> occasionally climb ramps and stairs; occasionally balance,
> stoop, kneel, crouch, crawl; never climb ladders, ropes, or
> scaffolding; never work in exposure to hazards, such as
> dangerous machinery and unprotected heights; a need to also
> avoid work with exposure to high humidity and temperature
> extremes; avoid even moderate exposure to dust, fumes,
> odors, gases, and other environmental irritants.  Please also
> assume the ability to frequently but not constantly use the
> upper extremities for work activities and the ability to
> understand, remember, and carry out work instructions learned
> within 30 days in a routine and repetitive work environment
> secondary to both symptoms of depression and side effects of
> medication.

(Administrative Record at 465-66.)   The vocational expert testified that under such

limitations, Stoll-Miner could not perform her past relevant work.  The vocational expert

further testified that Stoll-Miner could perform the following work:  (1) clerical tasks

worker (500 positions in Iowa and 140,000 positions in the nation), (2) photocopy machine

operator (750 positions in Iowa and 35,000 positions in the nation), (3) small parts

assembler (10,000 positions in Iowa and 500,000 positions in the nation), (4) addresser or

document preparer (800 positions in Iowa and 250,000 positions in the nation), and

(5) surveillance system monitor (350 positions in Iowa and 60,000 positions in the nation).

### C.  Stoll-Miner's Medical History

On October 17, 2005, Stoll-Miner presented herself at the University of Iowa

Hospitals and Clinics ("UIHC") complaining of a bad cough.  Dr. Susan Langbehn, M.D.,

noted that Stoll-Miner's cough "has been progressively worse with dyspnea, sweating while coughing, [and she has been] unable to sleep $> 2$ hrs."[7]   Upon examination, Dr. Langbehn found that before nebulizer treatment, Stoll-Miner's air movement in her lungs, was "very poor."   After nebulizer treatment, her air movement improved. Dr. Langbehn concluded that Stoll-Miner had exacerbated asthma/COPD.  Stoll-Miner was admitted into the hospital and placed on an Albuterol inhaler.   She was also prescribed Duoneb, Flovent, and Prednisone.   Her respiratory symptoms improved and she was discharged on October 19, 2005, in stable condition.   At a follow-up appointment on October 25, 2005, Stoll-Miner informed Dr. Maria Gonzalez Berlari, M.D., that she was "feeling much better, . . . breathing without difficulties, . . . exercising every day, walking 1/2 mile, . . . [and] not . . . smoking since [she was] discharge[d]."[8] Dr. Gonzalez Berlari recommended that Stoll-Miner continue her medication as treatment.

On March 31, 2006, Stoll-Miner was referred to the Psychiatry Department at the UIHC by the Pulmonary Rehabilitation Department due to her tearfulness and depression. Stoll-Miner informed Dr. Sarah Adlakha, D.O., that:

> she has been feeling more depressed over the past two to three weeks, and believes that she has many issues that she has not dealt with that are now coming to the surface.  She states her sister was murdered by her brother in law (the sister's husband) four years ago, and this year at the time of her death anniversary the sister's daughter ([Stoll-Miner's] niece) is getting married.  She feels guilty that she has not been the one to plan the wedding, and is worried about seeing the rest of the family as they have not all been together since her sister's funeral.  She admits that she has a significant history of substance dependence, and claims that she was clean for about 7 years, until the death of her sister.  At that time she started using again, and eventually was able to stop in 11/04. . . . She does endorse many [signs] of depression that have lasted for

---

[7] Administrative Record at 227.

[8] Administrative Record at 217.

the last 2-3 weeks, including increased tearfulness, sleeplessness, increased appetite, depression, poor concentration, and anhedonia. She also admits that she has suicidal ideations about once per week, but states that she has no intention of killing herself and is able to report many barriers to suicide.

(Administrative Record at 261.) Dr. Adlakha noted that Stoll-Miner had three previous suicide attempts in the past. Her first suicide attempt occurred when Stoll-Miner was 22, and she overdosed on prescription medications. A few years later, Stoll-Miner "threw a blow dryer into the tub with herself."[9] Stoll-Miner's third suicide attempt occurred when she was 30, and she overdosed on her grandfather's blood pressure medication. She was hospitalized for one week on a psychiatric unit after the third suicide attempt. Dr. Adlakha further noted that "[a]ll of [Stoll-Miner's] suicide attempts were during the time when she was using illicit substances, including crack/cocaine."[10] Dr. Adlakha diagnosed Stoll-Miner with major depressive disorder and polysubstance dependence in remission. Dr. Adlakha recommended an increase in her dosage of Wellbutrin for her depression, a two-week trial of Trazodone for her insomnia, and starting psychotherapy as treatment.

On April 7, 2006, Stoll-Miner met with David Englestad, M.A., and Dr. Frank S. Gersh, Ph.D., at the request of Disability Determination Services ("DDS"), for a psychodiagnositic mental status examination. Upon examination, Englestad and Dr. Gersh noted that Stoll-Miner was restless and sometimes agitated. Englestad and Dr. Gersh also noted that she cried frequently throughout the interview. Englestad and Dr. Gersh found her attention and concentration to be marginal, and her memory varied. Englestad and Dr. Gersh also found that her "discussion gave no overt indication of disturbed thought processes such as delusional thinking or abnormal perceptual experience, but she does have

---

[9] Administrative Record at 261.

[10] *Id.*

16

some paranoia with regard to involvement in social interactions."[11]   Englestad and

Dr. Gersh also concluded that Stoll-Miner has a "very negative self-esteem and restricted

affect."[12] Englestad and Dr. Gersh diagnosed Stoll-Miner with polysubstance dependence,

sustained full remission, major depressive disorder, anxiety disorder, and borderline

personality disorder.  Englestad and Dr. Gersh assessed Stoll-Miner with a GAF score of

31.  Englestad and Dr. Gersh concluded that:

> [Stoll-Miner] is a 37-year-old Caucasian female who presents
> with significant history for physical and sexual abuse,
> substance abuse, depressed mood, and difficulties in
> employment and personal relationships related to these factors.
> She is currently under care at the University of Iowa
> Psychiatry, but continues to struggle with depressed mood and
> anxiety.  She currently does not demonstrate the mental skills
> to effectively remember and understand instructions,
> procedures, and locations in a work setting.  She appears to be
> challenged in her ability to carry out instructions, including
> maintaining attention, concentration, and pace.  She would
> likely struggle in her interaction with supervisors, co-workers
> and the public because of her emotional distress.  She does not
> appear to be one who has used good judgment and would
> likely struggle with adapting to changes in the work
> environment.

(Administrative Record at 254-55.)

On May 9, 2006, Dr. Claude Koons, M.D., reviewed Stoll-Miner's medical records

and provided DDS with a physical residual functional capacity ("RFC") assessment for

Stoll-Miner.  Dr. Koons determined that Stoll-Miner could:  (1) occasionally lift and/or

carry 50 pounds, (2) frequently lift and/or carry 25 pounds, (3) stand and/or walk with

normal breaks for at total of about six hours in an eight-hour workday, (4) sit with normal

breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull

---

[11] *Id.* at 254.

[12] *Id.*

without limitations.   Dr. Koons further determined that Stoll-Miner should avoid concentrated exposure to extreme cold, fumes, odors, dusts gases, and poor ventilation. Dr. Koons found no postural, manipulative, visual, or communicative limitations.

On May 17, 2006, Dr. Lon Olsen, Ph.D., reviewed Stoll-Miner's medical records and provided DDS with a Psychiatric Review Technique and mental RFC assessment for Stoll-Miner.  On the Psychiatric Review Technique assessment, Dr. Olsen diagnosed Stoll-Miner with major depressive disorder, anxiety disorder, and borderline personality disorder.  Dr. Olsen determined that Stoll-Miner had the following limitations:  mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Olsen determined that Stoll-Miner was moderately limited in her ability to:  understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting.  Dr. Olsen concluded that:

> [Stoll-Miner] does have [medically determinable impairments], but they would not prevent her from performing work-like activities.  She would have some difficulty understanding, remembering, and carrying out detailed instructions, maintaining attention, concentration, and pace, interacting with coworkers and the public, responding appropriately to criticism from supervisors, and adjusting to changes in routine. She would be capable of activities that did not require attention to detail, sustained vigilance, rapid pace, extensive contact with coworkers or the public, intense supervisory oversight, or frequent changes in routine.

(Administrative Record at 291.)

On June 20, 2006, Stoll-Miner met with Dr. Jessica Lutz, D.O., regarding her fibromyalgia.  Upon examination, Dr. Lutz noted that "[Stoll-Miner] has some difficulty getting up out of the chair in the exam room; however, once she is moving around and distracted, she has a very normal gait.  She has pain with palpation all over."[13]  Dr. Lutz diagnosed Stoll-Miner with fibromyalgia.   Dr. Lutz prescribed Nortriptyline and Ketoprofen and recommended daily aerobic exercise as treatment.

On November 7, 2006, at the request of DDS, Stoll-Miner underwent a disability evaluation.  Stoll-Miner informed Dr. Salaish K. Sarin, M.D., that she has:

> pain all the time in her joints and muscles.  Her legs get numb and tingly if they are hanging.  Her hands and wrists are in pain.  She states that if she sits in one position, her knees, ankles, and joints hurt.  She is depressed as well.  She states she has gained an inordinate amount of weight while on the prednisone.

(Administrative Record at 320.)  Dr. Sarin further noted that Stoll-Miner complained of fatigue, calf pain when walking, weakness in her extremities, memory difficulties, problems sleeping, and depression.  Upon examination, Dr. Sarin concluded that Stoll-Miner was limited due to chronic lung problems and psychological issues which were not under control.  Dr. Sarin also opined that her "fibromyalgia limits her ability to work as well."[14]

On December 1, 2006, Dr. Jan Hunter, D.O., reviewed Stoll-Miner's medical records and provided DDS with a physical RFC assessment for Stoll-Miner.  Dr. Hunter determined that Stoll-Miner could:   (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for at total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations.

---

[13] Administrative Record at 304.

[14] Administrative Record at 321.

Dr. Hunter further determined that Stoll-Miner could occasionally climb, balance, stoop, kneel, crouch, and crawl.  Dr. Hunter also opined that Stoll-Miner should avoid moderate exposure to fumes, odors, dusts, gases, and poor ventilation.  Dr. Hunter found no manipulative, visual, or communicative limitations.  Dr. Hunter concluded that:

> Review of [Stoll-Miner's activities of daily living] finds that she lives alone in a house, cares for a dog, prepares meals, cleans each week, and shops for groceries. . . .  She does have fibromyalgia for which increased activity is recommended and also has a history of non-listing level asthma.  The preponderance of all the evidence in this claim supports the conclusion that [Stoll-Miner] is capable as outlined.

(Administrative Record at 328.)

In March 2008, Stoll-Miner met with Dr. Kate DuChene Thoma, M.D., complaining of fibromyalgia pain.  Upon examination, Dr. DuChene Thoma found that Stoll-Miner:

> has normal strength in her upper and lower extremities.  Her gait is mildly impaired with a wide gait and slow.  Upper extremity sensation intact.  She has no swelling of any of her upper extremity joints.  She is tender behind [her] occiput, her neck, her elbows, her hips and her medial knees.  There is no lower extremity edema.

(Administrative Record at 357.)  Dr. DuChene Thoma diagnosed Stoll-Miner with fibromyalgia.  Dr. DuChene Thoma recommended an increase in her dosage of Nortriptyline and encouraged exercise as treatment.

In November 2008, Stoll-Miner met with Dr. John W. Ely, M.D., complaining of pain and burning in her feet.  Stoll-Miner reported difficulty sleeping due to the pain in her feet.  Dr. Ely performed a monofilament test on Stoll-Miner's feet, and noted that she "missed" most of the challenges to both feet.  Dr. Ely indicated that Stoll-Miner could feel the monofilament better on her right foot, and she could feel much less on her feet than her hands.  Dr. Ely diagnosed Stoll-Miner with peripheral neuropathy.  Dr. Ely treated Stoll-Miner with medication.

On December 19, 2008, Dr. Ely filled out a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" for Stoll-Miner's attorney. Dr. Ely determined that Stoll-Miner could: (1) occasionally lift and/or carry 10 pounds, (2) frequently lift and/or carry less than 10 pounds, (3) stand and/or walk with normal breaks for less than two hours in an eight-hour workday, (4) sit with normal breaks for less than six hours in an eight-hour workday, and (5) push and/or pull with limitations in the lower extremities. Dr. Ely also noted that Stoll-Miner would need to periodically alternate between sitting and standing to relieve pain or discomfort throughout a workday. Dr. Ely listed peripheral neuropathy, fibromyalgia, COPD, and back pain as support for his conclusions regarding Stoll-Miner's exertional limitations. Dr. Ely found that Stoll-Miner could occasionally climb, balance, and crawl. Dr. Ely further found that Stoll-Miner could never kneel, crouch, or stoop. Dr. Ely determined that Stoll-Miner was limited in her ability to reach in all directions, finger, and feel with her hands. Lastly, Dr. Ely found that Stoll-Minor should avoid temperature extremes, vibration, humidity/wetness, hazards such as machinery and heights, fumes, odors, chemicals, and gases.

In March 2009, Stoll-Miner met with Dr. Aaron T. Olson, M.D., complaining of burning feet. She stated that her feet "feel like she is stepping on hot burning coals 24/7."[15] She also reported difficulty sleeping due to the pain in her feet. Specifically, she stated that she was only getting "a couple" hours of sleep at night. Upon examination, Dr. Olson diagnosed Stoll-Miner with peripheral neuropathy. Dr. Olson treated her with medication.

In May 2009, Stoll-Miner met with Dr. Ely, and continued to complain "bitterly" about burning in her feet. Dr. Ely performed monofilament testing, and found that Stoll-Miner had decreased sensation in her feet. Dr. Ely noted that Stoll-Miner "missed about 50% of the challenges on her toes and she said the monofilament felt much different on her

---

[15] Administrative Record at 732.

21

feet than on her hands."[16]   Dr. Ely diagnosed Stoll-Miner with peripheral neuropathy, and continued to treat her with medication.   In July 2009, Stoll-Miner had a follow-up appointment with Dr. Ely, and reported that her peripheral neuropathy was improved.   She attributed her improvement to the addition of Lyrica as medication.   Dr. Ely noted, however, that Stoll-Miner "is currently trying to get another prescription paid for, and the medical assistance program is helping her with this.   She is very tearful during the interview, said that she was depressed about not been [sic] able to continue the Lyrica because of cost and that she had a lot of stress related to her burning feet."[17]   Dr. Ely diagnosed Stoll-Miner with idiopathic peripheral neuropathy involving feet.   Dr. Ely continued to prescribe medication as treatment.

In June 2010, Stoll-Miner underwent left ankle arthroscopy and debridement of an OCD lesion.   Stoll-Miner injured her ankle in February 2009 which was treated conservatively.   She reported ongoing activity related-pain, and imaging studies showed a Taylor OCD lesion.   Stoll-Miner elected to undergo surgery in June 2010.   At a follow-up appointment in late July 2010, Stoll-Miner reported that she was "overall very happy [with] the results [of the surgery]."[18]   Upon examination, Dr. Phinit Phisitkul, M.D., found that Stoll-Miner was doing "very well" and was able to bear weight on her left leg without any pain.

On August 13, 2010, Dr. Ely wrote a letter to the ALJ in response to her request for an explanation of his reasons for the restrictions he provided in the December 2008 medical source statement for Stoll-Miner.   The letter quotes Dr. Ely's treatment notes and indicates that his restrictions were based on his diagnosis of peripheral neuropathy for

---

[16] *Id.* at 739.

[17] Administrative Record at 743.

[18] *Id.* at 779.

Stoll-Miner.  Dr. Ely noted that "[t]here is not an objective way to measure the pain in her feet.  We can measure sensation with a monofilament challenge, but not pain."[19]

On September 3, 2010, Stoll-Miner was referred by DDS to Dr. Robert J. Schultes, M.D., for a consultative examination.  Dr. Schultes noted that:

> Tracey Stoll-[M]iner is a 41 year old lady who states she is unable to work for the following reasons.  She states that she has had pain and fatigue secondary to fibromyalgia for about 10 years.  Patient feels achy.  She can't sit or stand.  She states that Dr. Ely told her not to lift more than 10 pounds. She said she's had peripheral neuropathy for 1 ½ years.  She said that her feet have been feeling number for about a year and a half and it's being caused by Prednisone and diabetes. She also has lung problems that cause her to cough and be short of breath for 9 years.  She's had problems with her memory which [s]he feels is due to Lyrica medication.  She forgets things she's said to other people.

(Administrative Record at 707.)  Upon examination, Dr. Schultes diagnosed Stoll-Miner with history of chronic pain and fatigue, secondary to fibromyalgia, peripheral neuropathy, COPD, decreased memory, and major depressive disorder.  In a medical source statement, Dr. Schultes opined that Stoll-Miner had the ability to:  (1) occasionally lift 10 to 20 pounds, (2) occasionally carry 10 pounds, (3) sit at one time for 45 minutes, (4) stand at one time for 10 minutes, (5) walk at one time for 10 minutes, (6) sit for a total of 1 hour in an eight-hour workday, (7) stand for at total of 30 minutes in an eight-hour workday, and (8) walk for a total of 20 minutes in an eight-hour workday.  Dr. Schultes indicated that for the majority of the day, Stoll-Miner would need to be in a recliner, or lie down in bed or on a couch.  Dr. Schultes also determined that Stoll-Miner could occasionally balance, but never climb, stoop, kneel, crouch, or crawl.  Dr. Schultes based his conclusions on Stoll-Miner's diagnoses of fibromyalgia, COPD, depression, and peripheral neuropathy.   Dr. Schultes also noted difficulty with concentration due to chronic

---

[19] *Id.* at 667.

depression. Lastly, Dr. Schultes opined that Stoll-Miner has had these limitations since 2004.

On September 15, 2010, Stoll-Miner was referred by DDS to Dr. Kathleen A. Kikendall, Ph.D., for a psychological evaluation. Dr. Kikendall noted that:

> In addition to physical health complaints, Ms. Stoll-Miner reports a history of depression that she states was first diagnosed when she was in her late 20's and in treatment for substance abuse. She has been treated off and on since that time. She reports that she has made three serious suicide attempts, the last one about 12 years ago when she tried to overdose on blood pressure pills. She denies current suicidal ideation but states that she has been very depressed, primarily secondary to her chronic pain.

(Administrative Record at 722.) Dr. Kikendall also reviewed Stoll-Miner's activities of daily living:

> Ms. Stoll-Miner reports that she lives a simple life and prefers to spend most of her time alone. She does go to church on a regular basis and has a good friend, 80 years old, who helps her out at times. This friend takes her to the grocery store about once a month and picks up things for her at other times. . . . She also reports a good relationship with several neighborhood children who help her carry laundry and visit her. She cooks for herself, primarily simple meals such as hamburger helper or prepackaged salads. She states that she used to love cooking but is no longer able to be on her feet this long. She does her own laundry. . . .

(Administrative Record at 723.) Dr. Kikendall diagnosed Stoll-Miner with major depressive disorder, history of polysubstance dependence, COPD, fibromyalgia, and peripheral neuropathy. Dr. Kikendall opined that "[w]hile Ms. Stoll-Miner does present with moderate depressive symptoms, these symptoms are not severe enough to prevent her

from employment and she states that it is her physical health concerns that are resulting in the most impairment."[20]   Dr. Kikendall concluded that:

> Ms. Stoll-Miner is able to remember, understand and follow instructions.   She is able to maintain attention and concentration. Her pace is adequate. She has adequate social skills and was able to engage interpersonally. She does have a history of some personality disorder symptoms and she may have difficulty getting along with others in the work site. Judgment and insight are grossly intact but she does have a history of poor judgment in financial affairs, relationships and substance abuse. She presents as cognitively able to manage finances but she may need assistance in managing her affairs wisely.

(Administrative Record at 724.)

## V.  CONCLUSIONS OF LAW

### A.  ALJ's Disability Determination

The ALJ determined that Stoll-Miner is not disabled.  In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations.   *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007); *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003).   The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g).  "If a claimant fails to meet

---

[20] Administrative Record at 724.

the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In order to establish a disability claim, "the claimant bears the initial burden to show that [he or] she is unable to perform [his or] her past relevant work." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id*. The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. §§ 404.1545, 416.945. "It is 'the ALJ's responsibility to determine [a] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own description of her limitations.'" *Page*, 484 F.3d at 1043 (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Stoll-Miner had not engaged in substantial gainful activity since May 20, 2002. At the second step, the ALJ concluded from the medical evidence that Stoll-Miner had the following severe impairments: fibromyalgia, diabetes mellitus, peripheral neuropathy, obesity, chronic obstructive pulmonary disease, status post ankle surgery, depression, and drug and alcohol abuse. At the third step, the ALJ found that Stoll-Miner did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Stoll-Miner's RFC as follows:

> [Stoll-Miner] has the residual functional capacity to perform light work . . . and can lift and carry 20 pounds occasionally and lift and carry 10 pounds frequently, can stand and walk 6 hours per day all with a sit/stand option, can occasionally climb ramps or stairs, balance, stoop, crouch, crawl or kneel,

> but never work in exposure to hazards such as dangerous
> machinery or unprotected heights, high humidity and
> temperature extremes, avoid even moderate exposure to dust,
> fumes, odors and other respiratory irritants, can frequently but
> not constantly use her upper extremities for work activity, and
> is able to understand, remember and carry out work
> instructions that can be learned within 30 days in a routine and
> repetitive work environment secondary to both symptoms of
> depression and side effects from medications.

(Administrative Record at 406.) Also at the fourth step, the ALJ determined that Stoll-Miner could not perform any of her past relevant work. At the fifth step, the ALJ determined that based on her age, education, previous work experience, and RFC, Stoll-Miner could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Stoll-Miner was not disabled.

### B.  Objections Raised By Claimant

Stoll-Miner argues that the ALJ erred in two respects. First, Stoll-Miner argues that the ALJ failed to properly evaluate the opinions of Dr. Ely, a treating physician, and Dr. Schultes, a consultative doctor.[21] Second, Stoll-Miner argues that the ALJ failed to

---

[21] Stoll-Miner also argues that the ALJ failed to properly evaluate or even consider the opinions of Dr. Sarin. In its initial judicial review ruling, the Court ordered the ALJ on remand to "recontact Dr[]. Sarin . . . to seek clarification of [his] opinions regarding Stoll-Miner's physical limitations and obtain supporting medical evidence, in order to properly evaluate [his] opinions. Additionally, if after recontacting the physicians, further examination is necessary to provide a complete record on the issue of Stoll-Miner's physical limitations, then a consultative examination should be purchased." Docket number 18, in case number 1:09-cv-00096-JSS at 26. There is no evidence in the record which suggests the ALJ recontacted Dr. Sarin. Furthermore, the ALJ does not address Dr. Sarin's opinions in her decision on remand. Moreover, in his brief, the Commissioner fails to even mention Dr. Sarin. In general, the Court expects that if it orders an ALJ to recontact a consultative doctor, the ALJ will do so. In the very least, the Court believes that an ALJ should address his or her reason for not recontacting a doctor on remand, if ordered to do so. Similarly, the Court expects that the Commissioner is his brief would address such an issue, particularly when it is raised by Stoll-Miner in her brief. While the Court would be appreciative of an explanation for the failure to address the opinions of
(continued...)

properly evaluate her subjective complaints of pain and disability.

### 1.    Dr. Ely's Opinions

Stoll-Miner argues that the ALJ failed to properly evaluate the opinions of her treating physician, Dr. Ely. Specifically, Stoll-Miner argues that the ALJ's reasons for discounting Dr. Ely's opinions are not supported by substantial evidence on the record. Stoll-Miner concludes that if properly evaluated, Dr. Ely's opinions should be afforded controlling weight.

An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted).

"Although a treating physician's opinion is entitled to great weight, it does not

---

[21](...continued)

Dr. Sarin, the Court acknowledges that the ALJ sought a consultative examination for Stoll-Miner on remand. The problem with Dr. Sarin's consultative examination was a lack of any opinion evidence on Stoll-Miner's functional capabilities. In the new consultative examination with Dr. Schultes, such a deficiency does not exist, as Dr. Schultes provided opinions on Stoll-Miner's functional capabilities. Because both Dr. Sarin and Dr. Schultes are one-time consultative examiners, and Dr. Schultes' examination included a statement on Stoll-Miner's functional capabilities, the Court finds that the record was properly developed on remand, and the ALJ's failure to address Dr. Sarin's opinions does not hamper the Court's review in this matter. *See Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007) (discussing an ALJ's duty to fully and fairly develop the record). The Court will not further directly address Dr. Sarin's opinions, and will address them only when deemed necessary.

automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

The regulations also require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id.*; *see also Tilley v. Astrue*, 580 F.3d 675, 680 (8th Cir. 2009) ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion.") (citation omitted).

In her decision, the ALJ addressed the opinions of Dr. Ely:

> Dr. Ely completed a residual functional capacity assessment dated December 19, 2008, and opined [Stoll-Miner] was limited to lifting/carrying 10 pounds, standing/walking up to 2 hours and sitting less than 6 hours in an 8-hour period. This assessment was given little weight where it was not supported by the objective evidence of Dr. Ely's own notes. The District Court ordered that the treating opinion of Dr. Ely be clarified. Therefore Dr. Ely was contacted and he wrote back. Dr. Ely noted [Stoll-Miner] complained bitterly of pain and burning in her feet. She had missed two EMG appointments. On examination, her tibial and pedis pulses were normal.

Although she missed monofilament challenges on both feet,
Dr. Ely notes this only measures sensation, not pain, and that
there was no objective way to measure [Stoll-Miner's] reported
pain. Although Dr. Ely indicated that peripheral neuropathy
was supported by EMG and NCV, the EMG/NCV study in
2008 showed only possible early or mild peripheral neuropathy
with minimally abnormal findings. The undersigned notes
[Stoll-Miner] failed two subsequently scheduled EMG studies.
the undersigned further notes that Dr. Ely recommended
[Stoll-Miner] engage in water aerobics for reported
fibromyalgia pain. He also recommended aerobic exercise
such as fast walking 20-60 minutes per day. These
recommendations are inconsistent with [Stoll-Miner's] reported
pain level and Dr. Ely's limitations. Furthermore, Dr. Ely's
[] notes from November 2008 indicated [Stoll-Miner] was
neurovasulcar intact. [Stoll-Miner] has repeatedly been
assessed with no neurological deficits. Based on this, it
appears any neurological deficits that might have existed have
resolved. During follow-up on July 3, 2010, [Stoll-Miner]
was doing very well without significant pain. She was
neurologically intact and circulation was normal. Sensation
was intact to light touch. During follow-up on July 29, 2010,
[Stoll-Miner] was weight bearing on her left lower extremity
without any pain.

In summary and in response to a request for an explanation as
to his reasoning for assessing [Stoll-Miner's] work restrictions
from December 2008, Dr. Ely states [Stoll-Miner] complained
bitterly of pain and there is no objective way to measure the
pain in her feet. This letter from Dr. Ely provides no other
medical explanation for these work restrictions other than that
he adopted [Stoll-Miner's] subjective complaints. This is
found insufficient to support the restrictions given the minimal
objective findings in the record and given [Stoll-Miner's]
actual activities and functioning noted throughout this decision.
This opinion is given not weight.

(Administrative Record at 408.)

Having reviewed the entire record, the Court finds that the ALJ properly considered

and weighed the opinion evidence provided by Dr. Ely. The Court also finds that the ALJ

provided "good reasons" for rejecting Dr. Ely's opinions.   *See* 20 C.F.R. § 404.1527(d)(2); *Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967.  Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole.  *Guilliams*, 393 F.3d at 801.

### 2.   *Dr. Schultes' Opinions*

Stoll-Miner argues that the ALJ failed to properly evaluate the opinions of her consultative examiner, Dr. Schultes.  Specifically, Stoll-Miner argues that the ALJ's reasons for discounting Dr. Schultes' opinions are not supported by substantial evidence on the record.  Stoll-Miner concludes that the ALJ's failure to credit the opinions of Dr. Schultes was error.

An ALJ is required to evaluate every medical opinion he or she receives from a claimant.  20 C.F.R. § 404.1527(d).  If the medical opinion is not from a treating source, then the ALJ considers the following factors for determining the weight to be given to the non-treating medical opinion:  "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors."  *Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(d)).  "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians.  The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'"  *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

In her decision, the ALJ addressed the opinions of Dr. Schultes:

> [Stoll-Miner] underwent a consultative examination with Robert Schultes, M.D. on September 3, 2010.  [Stoll-Miner] reported she was unable to work due to fibromyalgia, and was unable to sit or stand.  She reported that Dr. Ely restricted her to lifting no more than 10 pounds.  She reported peripheral neuropathy since 2008 with numbness in her feet.  She reported lung problems and shortness of breath.  She reported memory problems due to Lyrica.  [Stoll-Miner] reported she

could lift 10 pounds, 30 minutes per day; carry 10 pounds[,] 45 minutes per day; stand 20 minutes per day; move 30 minutes per day; walk 4 blocks per day[;] sit 1 hour per day; kneel 3 to 4 times per day[;] and travel 1.5 hours per day. Upon examination, there was slight tenderness in the right upper quadrant but no rebound. [Stoll-Miner] had decreased sharp sensation to the mid-legs bilaterally. Reflexes were all 1/1. Mini-mental status was 29 out of 30. [Stoll-Miner] was diagnosed with history of chronic pain and fatigue, secondary to fibromyalgia; peripheral neuropathy; COPD; decreased memory; major depressive disorder; History of hepatitis C; glucose intolerance; and contracture right hand. Grip strength was 5/5. Upper extremity muscle strength was 5/5. Lower extremity muscle strength was 5/5. Although Dr. Schultes concluded [Stoll-Miner] could perform less than sedentary work (i.e. only sit for 1 hour during an 8-hour period), this is not based on any objective findings during the examination, but rather, [Stoll-Miner's] self-reports of pain and limitations. In fact, in his Medical Assessment form, Dr. Schultes recites [Stoll-Miner's] specific subjectively reported limitations. For example, he states, as did [Stoll-Miner] in her examination, that she is able to sit one hour a day, stand thirty minutes a day, walk twenty minutes a day. This is not an exercise of independent medical judgment based upon examination and clinic signs and findings. Another example, Dr. Schultes noted [Stoll-Miner] said she had finger stiffness secondary to fibromyalgia and concluded contracture of the right hand with problems in all areas of fine and gross manipulation, but his physical examination of [Stoll-Miner] evidenced she had 5/5 grip strength on examination. As Dr. Schultes did no more than repeat [Stoll-Miner's] subjective complaints and these are not supported by his own physical examination of [Stoll-Miner], his opinions . . . are rejected.

(Administrative Record at 411.)

Having reviewed the entire record, the Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Schultes. The Court also finds that the ALJ properly considered and applied the factors for evaluating a consultative examiner's opinions. *See Wiese*, 552 F.3d at 731. Accordingly, even if inconsistent conclusions

could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 3.   Credibility Determination

Stoll-Miner argues that the ALJ failed to properly evaluate her subjective allegations of disability.   Stoll-Miner maintains that the ALJ's credibility determination is not supported by substantial evidence.   The Commissioner argues that the ALJ properly considered Stoll-Miner's testimony, and properly evaluated the credibility of her subjective complaints.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  The absence of objective medical evidence to support a claimant's subjective complaints is also a relevant factor for an ALJ to consider.  *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citation omitted).   The ALJ, however, may not disregard a claimant's subjective complaints "solely because the objective medical evidence does not fully support them." *Polaski*, 739 F.2d at 1322; *see also Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006) ("In discrediting subjective claims, the ALJ cannot simply invoke *Polaski* or discredit the claim because they are not fully supported by medical evidence.").

Instead, "'[a]n ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole.'" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (quoting *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997)); *see also Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's

complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'detail the reasons for discrediting the testimony and set forth the inconsistencies found.'" *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008) (quoting *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)); *see also Baker v. Apfel*, 159 F.3d 1140, 1144 (8th Cir. 1998) ("When rejecting a claimant's complaints of pain, the ALJ must make an express credibility determination, must detail reasons for discrediting the testimony, must set forth inconsistencies, and must discuss the *Polaski* factors."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Guilliams*, 393 F.3d at 801 (explaining that deference to an ALJ's credibility determination is warranted if the determination is supported by good reasons and substantial evidence); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Wagner*, 499 F.3d at 851 (quoting *Pearsall*, 274 F.3d at 1218).

In addressing Stoll-Miner's credibility, the ALJ made the following observations:

> In summary, the undersigned does not find the testimony of [Stoll-Miner], that she is unable to sustain any full time work activities, to be fully supported by the record. As discussed above, the record does not contain objective signs and findings to support the degree of limitation asserted by [Stoll-Miner] as discussed above. Further her own activities and functioning do not support her subjective complaints. She is able to walk to the store across the street from her home, she reads, she attends church each week, she does some volunteer activities for her church, she has friends and talks with them over the telephone and they take her to the store. During the period of

34

time at issue, she has also traveled out of state by bus and had dated some.

Furthermore, inconsistencies between [Stoll-Miner's] testimony and the record detract from her credibility. For example, [Stoll-Miner] testified that she had been clean and sober from substances for over five years, from her relapse in 2004. However, as recently as July 2010, [Stoll-Miner] reported drinking a liter of rum a day four days a week. With respect to her other impairments, for example, [Stoll-Miner] testified she was using her nebulizer treatment 4-5 times per day. But, [Stoll-Miner] sought treatment two times per day and had previously been only using it once per day. Additionally, a review of [Stoll-Miner's] work history shows that [she] worked only sporadically prior to the alleged disability onset date, which raises a question as to whether [her] continuing unemployment is actually due to medical impairments.

While [Stoll-Miner] establishes impairments that could reasonably be expected to produce some of the symptoms alleged, support for [her] allegations as the frequency, intensity and persistence of these symptoms is lacking in the record for all the reasons just summarized above and noted in detail throughout this decision. The undersigned also does not fully accept [Stoll-Miner's] allegations due to inconsistencies regarding [her] resultant limitations and her actual functioning, also noted above.

(Administrative Record at 411-12.)

It is clear from the ALJ's decision that she thoroughly considered and discussed Stoll-Miner's treatment history, medical history, functional restrictions, and activities of daily living in making her credibility determination. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Stoll-Miner's subjective allegations of disability were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges

and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Stoll-Miner's subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson*, 240 F.3d at 1148. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## VI.  CONCLUSION

The Court finds that the ALJ properly considered the medical evidence and opinions in the record, including the opinions of Dr. Ely and Dr. Schultes. The ALJ also properly determined Stoll-Miner's credibility with regard to her subjective complaints of pain and disability. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VII.  ORDER

For the foregoing reasons, it is hereby **ORDERED**:

1. The final decision of the Commissioner of Social Security is **AFFIRMED**;

2. Plaintiff's Complaint (docket number 3) is **DISMISSED** with prejudice; and

3. The Clerk of Court is directed to enter judgment accordingly.

DATED this ___7th___ day of March, 2012.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA